

1   MORGAN, LEWIS & BOCKIUS LLP
    BARBARA A. FITZGERALD, SBN 151038
2   bfitzgerald@morganlewis.com
    SALVATORE PICARIELLO, SBN 190442
3   spicariello@morganlewis.com
    300 South Grand Avenue, 22nd Fl.
4   Los Angeles, CA  90071-3132
    Tel:  213.612.2500
5   Fax:  213.612.2501

6   Attorneys for Defendant
    COGNIZANT TECHNOLOGY
7   SOLUTIONS U.S. CORPORATION,
    erroneously identified as COGNIZANT
8   TECHNOLOGY SOLUTIONS

9                   UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11

12  JONATHAN BEASLEY; IRINA          Case No. CV11-04974 JFW (MRWx)
    MASHAROVA; ANNA RSHTOUNI;
13  MARCELO PINEDA; CHARLES          DEFENDANT COGNIZANT
14  PRICE; YURI GRISHKO; TSUNG-      TECHNOLOGY SOLUTIONS U.S.
    HSIEN SHEN; TIM LUK; DAVID       CORPORATION'S NOTICE OF
15  DE HILSTER; LILY BUMATAY;        REMOVAL TO THE UNITED
    PARTHA CHOUNDRY; TIM             STATES DISTRICT COURT FOR
16  BGUYEN; JAMES NGUYEN;            THE CENTRAL DISTRICT OF
    EDWARD DUONG; ISMAIL             CALIFORNIA
17  GUZEY; STEVE MO; BONITA
    SHOK; and KAREN KU,              [28 U.S.C. §§ 1331, 1441, and 1446]

18                  Plaintiffs,

19
    vs.
20
    COGNIZANT TECHNOLOGY
21  SOLUTIONS U.S. CORPORATION
    (erroneously identified as
22  COGNIZANT TECHNOLOGY
    SOLUTIONS, a California business,
23  form unknown); MOLINA
    HEALTHCARE, INC., a California
24  business, form unknown; AMIR
    DESAI, an individual and managing
25  agent for MOLINA HEALTHCARE,
    INC.; and DOES 1 to 50, inclusive,
26
                    Defendants.
27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/22481322.2                                        NOTICE OF REMOVAL

1   **TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT**

2   **COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA:**

3         PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §§ 1331, 1441, and

4   1446, Defendant COGNIZANT TECHNOLOGY SOLUTIONS U.S.

5   CORPORATION (erroneously identified as COGNIZANT TECHNOLOGY

6   SOLUTIONS) ("Defendant") hereby removes the above-entitled action from the

7   Superior Court of the State of California, in and for the County of Los Angeles, to

8   the United States District Court for the Central District of California.  Removal is

9   based on the following grounds:

10   **I.**    <u>**THE REMOVAL IS TIMELY**</u>

11         Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is timely because it

12   has been filed within thirty days of May 13, 2011, the date upon which the service

13   of the Summons and Complaint was deemed complete pursuant to the execution of

14   the Acknowledgement of Receipt (Cal. Code Civ. Proc. § 415.30).  (True and

15   correct copies of the Complaint, Proof of Service of Summons, Notice and

16   Acknowledgement of Receipt, and Summons are attached hereto as <u>Exhibits 1</u>

17   <u>through 4</u>, respectively).  No previous Notice of Removal has been filed or made

18   with this Court for the relief sought herein.  John L. Barber, Esq., counsel for

19   Defendant Molina Healthcare, Inc. ("Molina"), consents to the removal of this

20   action.  Edward B. Raskin, counsel for Amir Desai ("Desai"), also consents to the

21   removal of this action.  Defendants Molina and Desai were served in this action on

22   June 3 and 8, 2011, respectively.

23   **II.**    <u>**THIS COURT HAS ORIGINAL SUBJECT MATTER JURISDICTION**</u>

24         Removal of this action is proper because 28 U.S.C. § 1441(a) authorizes

25   removal of "any civil action brought in State court of which the district courts of the

26   United States have original jurisdiction."  This Court has original jurisdiction over

27   Plaintiff's action because it "aris[es] under the Constitution, laws, or treaties of the

28   United States."  *See* 28 U.S.C. § 1331.

1    For purposes of federal-question jurisdiction, it is well settled that a state-law

2    claim can "arise under" federal law even when the plaintiff has not brought a

3    federal claim. *See Grable & Sons Metal Prods., Inc. v. Darue Engineering & Mfg.*,

4    545 U.S. 308, 312 (2005). In *Grable*, the United States Supreme Court observed

5    that "federal question jurisdiction will lie over state-law claims that implicate

6    significant federal issues." *Id.* (citing *Hopkins v. Walker*, 244 U.S. 486, 490-491

7    (1917)). A significant federal issue is one "actually disputed and substantial, which

8    a federal forum may entertain without disturbing any congressionally approved

9    balance of federal and state judicial responsibilities." *Id.* at 314. The Supreme

10   Court explained that the doctrine of federal "arising under" jurisdiction "captures

11   the commonsense notion that a federal court ought to be able to hear claims

12   recognized under state law that nonetheless turn on substantial questions of federal

13   law and, thus, justify resort to the experience, solicitude, and hope of uniformity

14   that a federal forum offers on federal issues." *Id.* at 312 (citation omitted).

15   Relying on *Grable*, numerous district courts have recognized that state-law

16   claims that implicate a significant federal issue, such as immigration, give rise to

17   federal-question jurisdiction. In *Avila-Gonzalez v. Barajas*, 2006 WL 643297

18   (M.D. Fla. Mar. 2, 2006), for example, the court held that it had subject-matter

19   jurisdiction over the state-law contract claims of plaintiffs, who were guest workers

20   under the so-called H-2A provisions of the Immigration and Nationality Act

21   ("INA"), "because they turn[ed] on interpretation of terms dictated by federal

22   statutes and regulations." *Id.* at *1 (citations omitted). The court further observed

23   that federal question jurisdiction was proper "because of the substantial federal

24   interest in immigration matters and in seeing that businesses honor the obligations

25   they assume in order to obtain governmental approval of their activities . . . ." *Id.*

26   Moreover, because of the limited number of H-2A workers admitted each year, the

27   court reasoned that federal jurisdiction over the plaintiffs' state law claims could be

28   exercised "'without disturbing any congressionally approved balance of federal and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

1    state judicial responsibilities.'" *Id.* (quoting *Grable*, 545 U.S. at 314).

2    Other district court decisions are in accord. *See, e.g., Mitchell v. Osceola*

3    *Farms Co.*, 408 F.Supp.2d 1275, 1279-1281 (S.D. Fla. 2005) (even though there is

4    no federal cause of action for alien workers under the INA, plaintiffs' state-law

5    claim that they were underpaid pursuant to government contracts invoked federal

6    question jurisdiction because (1) the crux of the claim concerned federally dictated

7    terms of clearance order and the terms were not clear, (2) "the federal interest in

8    regulating immigration is unquestionably substantial," and (3) "federal question

9    jurisdiction in matters such as this would not open the flood gates and disturb 'any

10   congressionally approved balance of federal and state judicial responsibilities.'");

11   *see also Mitchell v. Bank of America, N.A.*, 2010 WL 3340486, at *3 (M.D. Fla.

12   Aug. 25, 2010) (removal from state court on the basis of federal question

13   jurisdiction was proper where plaintiff's state law claims "necessarily depends on

14   the resolution of a substantial question of federal law, namely Defendants' alleged

15   violation of the Fair Debt Collection Practices Act."); *Becnel v. KPMG LLP*, 387

16   F.Supp.2d 984, 986 (W.D. Ark. 2005) (federal question jurisdiction existed over

17   plaintiffs' state law claims because the only way to determine whether KPMG's

18   investment program was legitimate was to interpret the relevant portions of the

19   United States Code relating to them).

20   Here, Plaintiffs' claims explicitly and necessarily implicate a number of

21   substantial federal questions. Indeed, the crux of Plaintiffs' complaint is that

22   Defendant violated several aspects of federal immigration law, and that these

23   alleged violations provided the basis upon which Plaintiffs were displaced from

24   their jobs. *See, e.g.*, Compl. ¶¶ 40-43 (alleging that Plaintiffs were displaced from

25   their jobs because of Defendant's false statements in H-1B Labor Condition

26   Applications ("LCAs") to the United States Department of Labor). To determine

27   whether Defendant violated immigration law, it will be necessary to interpret the

28   applicable federal statutes and regulations to ascertain Defendant's disclosure

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

1    obligations, the applicability and scope of any exemptions that may affect these

2    disclosure obligations (*e.g.*, 20 C.F.R. § 655.737 (attestation obligations regarding

3    displacement not applicable if an H-1B nonimmigrant receives wages of at least

4    $60,000 per year)), Defendant's compliance with these statutes and regulations, and

5    the legal effect of Defendant's LCA attestations to the United States Department of

6    Labor.

7         In addition, the federal issues raised by Plaintiffs are clearly "substantial."  It

8    cannot seriously be argued that the issue of whether the Department of Labor is

9    intentionally deceived (as Plaintiffs claim) in order to obtain LCA approvals was

10   insignificant. *See Avila-Gonzalez*, 2006 WL 643297, at *1 ("Federal question

11   jurisdiction is appropriate because of the substantial federal interest in immigration

12   matters and in seeing that businesses honor the obligations they assume in order to

13   obtain governmental approval of their activities . . .").

14        Further, Plaintiffs' claims are those which "a federal forum may entertain

15   without disturbing any congressionally approved balance of federal and state

16   judicial responsibilities." *Grable*, 545 U.S. at 314.  Here, as in *Avila-Gonzalez*,

17   there are a limited number of workers admitted each year pursuant to the

18   regulations at issue. *See* U.S.C. 8 § 1184(g)(1)(A)(vii) (total number of aliens who

19   may be issued visas or otherwise provided nonimmigrant status may not exceed

20   65,000 per year after 2004).  Thus, federal question jurisdiction in this matter would

21   not open the judicial flood gates. *Mitchell*, 408 F.Supp.2d at 1279-1281

22        Removal under federal question jurisdiction is therefore proper pursuant to

23   28 U.S.C. §§ 1331, 1441, and 1446.

24   **III.   <u>VENUE</u>**

25        This action was originally filed in the Superior Court for the County of Los

26   Angeles – South District.  Venue is therefore proper in this district, pursuant to 28

27   U.S.C. § 1441(a), because it encompasses the county in which this action has been

28   pending.

1  IV.  **NOTICE**

2      Defendant will promptly serve this Notice of Removal on all parties and will

3  promptly file a copy of this Notice of Removal with the clerk of the state court in

4  which the action is pending, as required under 28 U.S.C. § 1446(d).

5  V.  **CONCLUSION**

6      Based on the foregoing, Defendant removes the above-captioned matter to

7  this Court.  If any question arises as to the propriety of the removal of this action,

8  Defendants request the opportunity to present a brief and oral argument in support

9  of its position that this case is removable.

10

11  Dated:  June 10, 2011              MORGAN, LEWIS & BOCKIUS LLP

12                                     By _____
13                                        Salvatore Picariello
14
15                                     Attorneys for Defendant
                                       COGNIZANT TECHNOLOGY
                                       SOLUTIONS U.S. CORPORATION
16                                     (erroneously identified herein as
                                       COGNIZANT TECHNOLOGY
17                                     SOLUTIONS)

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/22481322.2                          5                    NOTICE OF REMOVAL

EXHIBIT 1

1  James A. Otto, SBN: 144432
   LAW OFFICE OF JAMES A. OTTO
2  19536 San Jose Street
   Northridge, California 91326
3  Telephone: (818) 366-8432
   Facsimile:  (818) 368-7757

4  Regina Ashkinadze (SBN 256908)
   LAW OFFICES OF REGINA ASHKINADZE
5  1219 Morningside Drive, Suite 128
   Manhattan Beach, California 90266
6  Telephone: (310) 285-8595
   Facsimile:  (310) 300-2112

7

8  Attorneys for Plaintiffs JONATHAN BEASLEY, IRINA
   MASHAROVA, ANNA RSHTOUNI, MARCELO PINEDA,
9  CHARLES PRICE, YURI GRISHKO, TSUNG-HSIEN SHEN,
   TIM LUK, DAVID DE HILSTER, LILY BUMATAY, PARTHA
10 CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD
   DUONG, ISMAIL GUZEY, STEVE MO, BONITA SHOK AND
11 KAREN KU

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR ?? 2011

John A. Clarke, Executive Officer/Clerk
By _____

CASE MANAGEMENT CONFERENCE
SET FOR 8:30 a.m.

SEP 1Q 2011

IN DEPARTMENT

12         **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

13           **COUNTY OF LOS ANGELES – SOUTH DISTRICT**

14

| | |
|---|---|
| JONATHAN BEASLEY; IRINA MASHAROVA; ANNA RSHTOUNI; MARCELO PINEDA; CHARLES PRICE; YURI GRISHKO; TSUNG-HSIEN SHEN; TIM LUK; DAVID DE HILSTER; LILY BUMATAY; PARTHA CHOUNDRY; TIM NGUYEN; JAMES NGUYEN; EDWARD DUONG; ISMAIL GUZEY; STEVE MO; BONITA SHOK; and KAREN KU,<br><br>        Plaintiffs,<br><br>  vs.<br><br>COGNIZANT TECHNOLOGY SOLUTIONS, a California business, form unknown; MOLINA HEALTHCARE, INC., a California business, form unknown; AMIR DESAI, an individual and managing agent for MOLINA HEALTHCARE, INC.; and DOES 1 to 50, inclusive,<br><br>        Defendants. | CASE NO:<br><br>**CIVIL COMPLAINT FOR:**<br><br>1. National Origin Discrimination;<br>2. Intentional Infliction of Emotional Distress;<br>3. Wrongful Termination in Violation of Public Policy;<br>4. Negligence;<br>5. Tortious Interference With Economic Advantage;<br>6. Violation of Unfair Business Practices Act;<br>7. Fraud in the Inducement;<br>8. Age Discrimination;<br>9. Failure to Take all Reasonable Steps to Prevent Discrimination;<br>10. Retaliation;<br>11. Violation of Labor Code, section 1102.5;<br>12. Failure to pay Overtime Pay. |

-1-

**COMPLAINT**

PLAINTIFFS, AND EACH OF THEM, ALLEGE AS FOLLOWS:

**THE PARTIES**

1.  Plaintiff, JONATHAN BEASLEY (hereinafter "Plaintiffs" or "BEASLEY"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

2.  Plaintiff, IRINA MASHAROVA (hereinafter "Plaintiffs" or "MASHAROVA"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

3.  Plaintiff, ANNA RSHTOUNI (hereinafter "Plaintiffs" or "RSHTOUNI"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

4.  Plaintiff, MARCELO PINEDA (hereinafter "Plaintiffs" or "PINEDA") is, and at all relevant times was, an individual residing in Los Angeles County, California.

5.  Plaintiff, CHARLES PRICE (hereinafter "Plaintiffs" or "PRICE"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

6.  Plaintiff, YURI GRISHKO (hereinafter "Plaintiffs" or "GRISHKO"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

7.  Plaintiff, TSUNG-HSIEN (JOEY) SHEN hereinafter "Plaintiffs" or "SHEN"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

8.  Plaintiff, TIM LUK (hereinafter "Plaintiffs" or "LUK"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

9.  Plaintiff, DAVID DE HILSTER (hereinafter "Plaintiffs" or "DE HILSTER"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

10.  Plaintiff, LILY BUMATAY (hereinafter "Plaintiffs" or "BUMATAY"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

-2-
**COMPLAINT**

11.    Plaintiff, PARTHA CHOUNDRY (hereinafter "Plaintiffs" or "CHOUNDRY"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

12.    Plaintiff, TIM NGUYEN (hereinafter "Plaintiffs" or "NGUYEN"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

13.    Plaintiff, JAMES NGUYEN (hereinafter "Plaintiffs" or "NGUYEN"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

14.    Plaintiff, EDWARD DUONG (hereinafter "Plaintiffs" or "DUONG"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

15.    Plaintiff, ISMAIL GUZEY (hereinafter "Plaintiffs" or "GUZEY"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

16.    Plaintiff, STEVE MO (hereinafter "Plaintiffs" or "MO"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

17.    Plaintiff, BONITA SHOK (hereinafter "Plaintiffs" or "SHOK"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

18.    Plaintiff, KAREN KU (hereinafter "Plaintiffs" or "KU"), is, and at all relevant times was, an individual residing in Los Angeles County, California.

19.    At all times relevant herein, Defendant COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION (hereinafter "COGNIZANT"), a California business, form unknown, was and is an entity, organized and existing under the laws of the State of California, having its principal place of operation within the County of Los Angeles.

-3-
**COMPLAINT**

20.     At all relevant times herein, Defendant MOLINA HEALTHCARE, INC. (hereinafter "MOLINA"), a California corporation, was and is an entity organized and existing under the laws of the State of California, with its principal place of business in the County of Los Angeles.

21.     Defendant, AMIR DESAI (hereinafter "DESAI") is, and at all relevant times relevant herein, was an individual residing in Los Angeles County, California.

22.     DOES ONE through FIFTY, inclusive, are sued herein pursuant to *Code of Civil Procedure* section 474.  Plaintiffs are informed and believe, and based on such information and belief, allege that the DOE defendants participated, condoned, acted, and/or conspired with others in the discriminatory employment and tortious practices that harmed Plaintiffs.  Plaintiffs are ignorant of the true names or capacities of the Defendants sued herein under fictitious names DOES ONE through FIFTY, inclusive.  Plaintiffs will amend this complaint to alleged their true names and capacities when the same are ascertained.

## JURISDICTION AND VENUE

23.     The harm complained of in this complaint occurred in Los Angeles County and all parties reside therein.

24.     Plaintiffs have sustained damages in excess of the minimal jurisdictional requirement of this court.

25.     Defendants' principal place of business operations is in Los Angeles County.

## FACTUAL ALLEGATIONS

26.     MOLINA is a healthcare insurance company engaged in the business of providing healthcare services exclusively through MEDICARE and MEDICAID.  Plaintiffs are informed and believe, and on that basis allege, that the entirety of MOLINA'S annual income comes from the U.S. taxpayer via the federal government, which pays the MEDICARE and MEDICAID

-4-

**COMPLAINT**

claims filed by MOLINA'S insureds.  In other words, public monies fund MOLINA.  Based on

MOLINA'S 2009 Annual Report, containing its financial information, MOLINA collected over $9

billon dollars from the U.S government just in the last three (3) years.  However, since 2006,

MOLINA has spent a large portion of the taxpayer's money to fire American workers and to hire an

abundance of workers brought in from India.  For example, in or around 2007 and 2008, MOLINA

terminated approximately 100 American workers in various states to make room for over 100

laborers from India to handle all of MOLINA'S U.S. business operations involving MEDICARE and

MEDICAID claims; MOLINA then billed the U.S. government for the cost it incurred by importing

workers from India.  By way of MOLINA'S operations, several billion of U.S. taxpayer dollars have

gone directly to India without any benefit to the American economy or to the U.S. taxpayer.

   27.  AMIR DESAI is an individual of Indian descent and a former Chief

Information Officer ("CIO") of MOLINA, who was employed from about 2006 to 2010.  DESAI

was ultimately responsible for making policy decisions on MOLINA'S behalf, such as the

employment status of employees and the national origin makeup within the Information Technology

Department (hereafter "IT") of MOLINA.

   28.  COGNIZANT is a corporation engaged in the business of supplying foreign

nonimmigrant employees holding H1-B visas to United States employers.  COGNIZANT imports the

H1-B employees almost exclusively from India, and leases said employees to United States

employers.  Plaintiffs are informed and believe, and thereon allege, that COGNIZANT has received

billions of dollars through its business practices, including through its dealings with MOLINA and, in

the process, has displaced literally millions of competent U.S. workers from their jobs.  Through this

practice, COGNIZANT has sent several billion U.S. taxpayer dollars to India without any benefit to

the American economy or to the U.S. taxpayer

**COMPLAINT**

29.     Over a period of the past three to four years, COGNIZANT has been supplying MOLINA, through DESAI, with nonimmigrant employees from India.  COGNIZANT, DESAI and MOLINA conspired to displace competent U.S employees of MOLINA with workers brought in by COGNIZANT.  In so doing, the defendants have bilked federal and state taxing authorities, violated various U.S. statutes, and harmed millions of U.S. workers, including the plaintiffs.

30.     COGNIZANT imports offshore labor by submitting Labor Condition Applications and obtaining approval from the United States Department of Labor.  Federal Immigration Law categorizes all Labor Condition Applications as either for (a) immigrant status or (b) non-immigrant status.

31.     If a foreign person desires to become a permanent resident of the United States, then he/she is considered to be an immigrant and must file documents to obtain a "green card".  If the foreigner fails to complete the "green card" process before physically relocating into the United States, then that foreigner is categorized as an "undocumented immigrant" or an "illegal alien."  This case **is not** about "undocumented immigrants" or "illegal aliens."

32.     If a foreign individual wishes to come into the United States for a limited purpose or a temporary time, then that person is labeled as a "non-immigrant" and must obtain a visa to be allowed entry into the United States.  Examples of "non-immigrant" visas are student, tourist, or employment.

33.     To obtain a non-immigrant employment visa, a United States employer (not the foreigner) must file a Labor Condition Application.  During the application process, the applicant/employer must file certain sworn statements with the Secretary of Labor.

-6-
**COMPLAINT**

34.     In 2005, Plaintiffs, and each of them, were employed by MOLINA in various capacities in the IT Department as security analysts and computer programmers, most of whom earned at least $75,000.00 per year, with benefits.  Plaintiffs, and each of them, excelled at their jobs and were rewarded with promotions, merit salary adjustments, and awards in recognition of their work.

35.     During the relevant time period, Plaintiffs, and each of them, ultimately reported to DESAI.

36.     Before DESAI was promoted as CIO, MOLINA'S IT Department was a diverse workplace, comprised of workers from many ethnic backgrounds and who were either United States citizens or green card holders.  A true and correct copy of MOLINA'S organization chart for the Information Technology department is attached hereto as "Exhibit 1".

37.     Plaintiffs are informed and believe, and based thereon allege that, in or about 2007, COGNIZANT solicited and convinced MOLINA through DESAI, that it should no longer do business with the Plaintiffs and other similarly situated U.S. workers.  In turn, DESAI promoted various other Indian nationals to director and managerial positions within the IT Department.  On information and belief, the Indian nationals that DESAI promoted were unqualified to be MOLINA'S managing agents.

38.     On information and belief, DESAI had a special relationship with COGNIZANT, which was fostered and maintained by COGNIZANT to influence DESAI'S decisions-making in furtherance of the conspiracy to replace competent, tax-paying Americans with nonimmigrant laborers.  Examples of said relationship include, on information and belief, in 2008, DESAI'S "business trip" to India for the purpose of visiting COGNIZANT'S offices in India and attending a ceremony hosted by COGNIZANT that included a special tree-planting in honor of

-7-
**COMPLAINT**

DESAI (MOLINA''S 2008 budget does not include any entry for travel expenses by any employee to India in 2008.)  In addition, Plaintiffs are informed and believe, and based thereon allege that, DESAI received various kickbacks and other financial incentives from COGNIZANT for using its services and replacing MOLINA'S American employees with COGNIZANT'S H1-B contractors.  A true and correct copy of photographs documenting DESAI'S visit to COGNIZANT'S offices in India and the tree-planting ceremony are attached hereto as "Exhibit 2".

39.     Over the subsequent three years, in furtherance of the conspiracy, MOLINA hired only Indian males who held H1-B visas for which COGNIZANT provided the verified Labor Condition Applications.  By January 2010, with the assistance of COGNIZANT, MOLINA'S IT Department was no longer diverse, and consisted of approximately 80%-90% Indian employees, who were supplied by COGNIZANT as a result of false statements COGNIZANT filed with the Department of Labor.  A true and correct copy of MOLINA'S organizational chart of the Information Technology department before Plaintiffs' termination is attached hereto as "Exhibit 3".  Larry Santucci, MOLINA'S (former) Director of the IT Department, at one point stated to Plaintiffs that since joining MOLINA'S IT Department in 2002, he had witnessed a complete change in the face of IT personnel such that all U.S. workers, even phenomenal workers, who were not Indian were laid off and replaced by Indians. Dixie Lewellen, MOLINA'S (former) Payroll Administrator, has also informed Plaintiffs that she processed new hires for the years 2007 to 2009, and questioned management on why only Indian nationals were being hired in MOLINA'S IT Department.

40.     Plaintiffs are informed and believe, and based thereon, allege that the majority of Indian nationals working for MOLINA between 2007 and 2010 are in the United States on an H1-B visa, the applications for which were processed by COGNIZANT.  To obtain an "H1-B visa" the applicant/employer must submit a signed, sworn declaration to the United States Department of

**COMPLAINT**

Labor affirming that it has (a) made a diligent search for American and/or green card holders to fill a job opening, but could not find any qualified U.S. workers who were willing to perform the job; (b) that the H1-B applicant is both a college graduate and competent to perform the job duties for which he seeks employment; (c) that no current U.S. employee will be adversely affected by the hiring of the H1-B applicant within the hiring company; and (d) that the H1-B applicant will be paid the higher of the prevailing wage rate in the area or the same wages and benefits as others in the job description.  To import labor on MOLINA'S behalf, COGNIZANT made false statements to the Department of Labor that harmed the Plaintiffs.  MOLINA knew that COGNIZANT had to, and did, make false sworn statements to the U.S. Secretary of Labor because MOLINA had previously filed Labor Condition Applications on its own behalf in 2006, 2007, 2008, and 2009.

41.     The reason that COGNIZANT had to provide false statements to the federal government was because COGNIZANT had to certify that, among other matters, there were no qualified United States citizens or residents who could perform the job functions sought for the compensation offered by MOLINA.  COGNIZANT, DESAI and MOLINA knew that Plaintiffs were qualified United States workers who were currently employed and fulfilling the job duties sought by MOLINA.  Further, in 2008 and 2009, the recession in the United States made it a virtual certainty that there were U.S. workers available to fulfill both MOLINA'S and COGNIZANT'S hiring needs.  COGNIZANT'S certification to the contrary was therefore false.

42.     On January 13, 2010, the United States Department of Labor approved COGNIZANT'S application for 40 H1-B visa holders from India to work at MOLINA for $50,000.00 per year without benefits.  To obtain said approval, COGNIZANT filed sworn declarations affirming that COGNIZANT is a H1-B dependent employer that uses excessive foreign labor, it had (a) made a diligent search for American and/or green card holders to fill any job

**COMPLAINT**

openings for programmers and security analysts at MOLINA, but could not find any qualified

Americans who were willing to perform the job for the salary offered; (b) that no current employees

(of MOLINA) would be adversely affected by the hiring of the H1-B workers; and (c) that the H1-B

workers would be paid the higher of the prevailing wages or the same as other MOLINA employees

in the same job positions with the same benefits as other programmers and security analysts.  A true

and correct copy of COGNIZANT'S Labor Certifications is attached hereto as "Exhibit 4".

43.    In granting the Labor Condition Applications filed by COGNIZANT, the

Department of Labor depended on the veracity of these sworn statements.  Plaintiffs are informed

and believe, and on that basis allege, that unless COGNIZANT submitted the sworn declarations

listed above, it would not have received approval from the Department of Labor for the importation

of foreign labor.  These statements submitted to the Department of Labor were untrue and formed

the basis for MOLINA, through DESAI, to displace U.S. workers with unqualified laborers from

India.  All of the conspirators, COGNIZANT, MOLINA and DESAI, profited significantly from this

transaction to the detriment of the Plaintiffs.

44.    On January 14, 2010, one day after the Department of Labor approved

COGNIZANT'S application for 40 H1-B workers, MOLINA and DESAI, fired approximately 40

competent and tax-paying programmers, managers and security analysts, who were either American

citizens or green card holders, in order to make room for the 40 H1-B visa holders provided by

COGNIZANT following its false certifications to the Department of Labor.  Most fired U.S. workers

were earning a minimum of $75,000 per year with benefits and many earned over $100,000 per year

with benefits.  The Plaintiffs are 18 of the 40 U.S. workers who were terminated by MOLINA.

Supriya Sood, MOLINA'S (former) Senior Vice-President of Human Resources, informed

MOLINA about her concern that the mass job terminations of the "innocent Americans" could be

-10-
**COMPLAINT**

illegal discrimination especially since there were jobs available for them, as well as, imminent future job openings at MOLINA with the integration of Unisys Corporation, a $100 million corporation MOLINA had purchased months before the mass termination. DESAI informed Ms. Sood and Josephine Wittenberg, MOLINA'S (former) Director of Human Resources, that he had his orders from upper management, thus the American workers must be fired from their job to make room for the Indian nationals.

45.     On the date that MOLINA fired Plaintiffs, it held a meeting, led by DESAI, and attended by Josephine Wittenberg, during which DESAI informed Plaintiffs that they were being terminated due to MOLINA'S unprofitable financial performance in the 4th quarter of 2009. Plaintiffs were further informed that in order to receive their final wages they were required to sign a severance agreement and waive their rights to sue MOLINA for any wrongdoing.  MOLINA knew these statements of fact to be untrue at the time that they were made to the Plaintiffs.  MOLINA intentionally made the false statements of fact to induce the Plaintiffs to release MOLINA from liability for its illegal conduct toward the Plaintiffs.

46.     The true facts were that, pursuant to the California *Labor Code*, the newly unemployed Plaintiffs were not required to sign any agreements to receive their final wages; that MOLINA'S finances did not take a downturn in 2009 or even the 4th quarter of 2009, but in fact its financial performance increased by over $500 million from 2008; MOLINA knew and approved of DESAI'S conduct of discrimination against U.S. workers in order to hire and promote Indian workers;  and that the reason MOLINA and DESAI fired the 40 U.S. workers was in furtherance of their conspiracy because DESAI needed to make room to bring in 40 more H1-B workers supplied by COGNIZANT.  True and correct excerpts of MOLINA'S annual financial report for the year 2009 are attached hereto as "Exhibit 5".

-11-

**COMPLAINT**

47.     Plaintiffs are informed and believe, and based thereon alleges, that according to Laura Onufrock, MOLINA'S (former) IT Department Budget Manger, after the January 14, 2010 job termination of 40 IT employees, including the Plaintiffs, Josephine Wittenberg, Supriya Sood, MOLINA, and DESAI authorized the hiring of approximately 160 new H1-B contractors provided by COGNIZANT.  Plaintiffs are informed and believe, and based thereon allege, that there were three (3) reasons for this course of action: (1) The need for so many H1-B contractors was due to the fact that most of the H1-B foreigners were not competent in the computer hardware or software field, and did not know the computer language utilized by MOLINA; (2) MOLINA had planned in mid-2009 numerous projects for the IT Department, which had to be completed that created plenty of work for both the U.S. workers and the foreign Indian labors, and (3) the contract between MOLINA and COGNIZANT required MOLINA to hire COGNIZANT'S  H1-B Indian imports.

48.     On information and belief, the COGNIZANT contractors retained by MOLINA were actually more expensive than the terminated American and green card-holding employees.  According to Laura Onufrock, MOLINA had performed numerous studies comparing the cost of imported foreign labor versus U.S. workers at MOLINA, which were communicated to MOLINA'S upper management.  Said studies established that MOLINA paid its U.S. workers an average of approximately $50 per hour (including managers and all benefits) while MOLINA paid COGNIZANT for its H1-B Indian contractors $72 per hour, per contractor.  MOLINA'S budget analyst stated in writing to MOLINA management that the H1-B contractor labor cost MOLINA between 144% to 180% more than the U.S. workers.  Ms. Onufrock's IT Department budget analysis for 2010 states that in 2010, after the mass layoff of all U.S. workers, the IT Department exceeded its annual budget by over $5.5 million dollars only three (3) month into the year (in March of 2010) **due to the increase in the number of laborers from India.**  Yet, MOLINA'S

management continued to insist on hiring the more expensive COGNIZANT H1-B contractors over the less expensive U.S. workers, who were more experienced and knew MOLINA'S business systems.

49.     MOLINA went $5.5 million over-budget despite the fact that MOLINA and COGNIZANT did not pay overtime wages.  To avoid paying overtime, MOLINA intentionally mislabeled employees as "exempt".  Supriya Sood and Josephine Wittenberg have stated to Plaintiffs that just before their job termination at MOLINA, they were investigating 60-70 mislabeled employees.  All of the plaintiffs were mislabeled as "exempt" employees, in spite of the fact that they do not "exercise discretion and independent judgment with respect to matters of significance" for MOLINA, which has refused to pay any of the plaintiffs' overtime wages that are due and owing.

50.     Instead of properly compensating its employee, both MOLINA and COGNIZANT preferred Indian H1-B workers who could be forced to work 60-80 hours per week without overtime pay.

51.     Plaintiffs are informed and believe, and on that basis allege, that each of them were replaced by unqualified H1-B workers, whose national origin, race and/or ethnicity was exclusively Indian (hereafter "H1-B employees"), supplied by COGNIZANT using false means to displace Plaintiffs.  MOLINA'S own supervisors, manager and directors all complained to upper management that the H1-B contractors supplied by COGNIZANT were not qualified to do the jobs that had been previously done competently by the American employees.  Put another way, the H1-B employees supplied by COGNIZANT did not have the skill sets, business knowledge or adequate knowledge of MOLINA'S processes for the positions held.  Plaintiffs are informed and believe, and on that basis allege, that MOLINA continues to use the same processes requiring the same skill sets that were supported by the Plaintiffs and other American citizens who were terminated.

-13-
**COMPLAINT**

52.     Based on the facts known to MOLINA and COGNIZANT leading up to the mass firing on January 14, 2010, and the allegations of facts that occurred after January 14, 2010, Plaintiffs allege that:

a)  COGNIZANT knowingly, intentionally and falsely certified that it was not able to find qualified United States citizens for job openings at MOLINA at the offered salary;

b)  COGNIZANT failed to conduct any recruitment campaign to find qualified U.S. workers.  COGNIZANT intended to, and did, deceive the United States government into providing H1-B visas to COGNIZANT, so that MOLINA could continue to fire competent, taxpaying U.S. workers and replace them with H1-B employees of Indian national origin, and so that COGNIZANT could continue to profit through its deception at Plaintiffs' expense and ultimately at the expense of the American taxpayer;

c)  COGNIZANT falsely certified that no currently employed U.S. worker would be adversely affected by COGNIZANT'S importation of foreign labor into the United States.  In fact, on information and belief, COGNIZANT solicited MOLINA to fire its American employees and to hire COGNIZANT'S H1-B employees; and

d)  COGNIZANT refused to pay the legally mandated wage rate to the H1-B workers, because the H1-B employees were paid approximately 50% less wages than their American counterparts.  COGNIZANT has a record of underpaying its H1-B foreigners because its filings with the Department of Labor on no less than three (3) occasions shows that COGNIZANT violated federal law by underpaying its H1-B Indian nationals.

53.     In so doing, the COGNIZANT-MOLINA-DESAI conspiracy violated the mandates of the California Constitution and various statutes, many of which impose a legal duty on the defendants not to harm Plaintiffs' interests.

-14-
**COMPLAINT**

54.     Plaintiffs are informed and believe, and based thereon allege, that in October 2010, nine months after the mass termination of Plaintiffs, Supriya Sood, MOLINA'S (former) Senior Vice-President of Human Resources, and Josephine Wittenberg, MOLINA'S (former) Director of Human Resources, conducted an investigation into the work environment of the IT Department due to continuing complaints of illegal discrimination.  The investigation established that the IT Department and MOLINA'S upper management indeed discriminated against American workers in favor of the Indian imports throughout 2009 and 2010, including the plaintiffs.

55.     MOLINA showed its bias against American citizens, and in favor persons of Indian national origin, ethnicity and/or race in various employment decisions that adversely affected American citizens employed in the IT Department. The following are examples of MOLINA'S employment decisions based on national origin, race, and/or ethnicity:

a)   Initially, MOLINA refused to allow a team of employees comprised of American citizens to become involved in the "OEMS" processes project because of costs. The OEMS processing project was considered to be a career-advancing project.  After denying the team of employees comprised of American citizens, MOLINA'S Indian management awarded the project and an increased budget to complete the project to a team of employees entirely comprised of Indian nationals so that the careers of only Indian nationals would be advanced.  However, DESAI had to approve the hiring of a significant number of consultants to assist the all-Indian team because the team was under-qualified to do the work.  Of course, ALL of the consultants that were hired were Indian males.  The defendants, and each of them, <u>demanded that Plaintiffs and other American employees drop everything that they were working on to train the H1-B Indian employees and consultants in the business operations and processes related to the OEMS project, which was the most basic computer software utilized by MOLINA.</u>  MOLINA was thereby "transferring" the

-15-
**COMPLAINT**

OEMS team's knowledge exclusively to the H1-B employees of Indian national origin so that these H1-B employees could replace the U.S. workers after termination.

b)   In furtherance of COGNIZANT'S false certification to the Department of Labor, attesting that COGNIZANT was not able to find qualified U.S. citizens, MOLINA'S managers, who were of Indian descent, did not interview American citizens for jobs but instead focused almost exclusively on applicants of Indian descent.  Dixie Lewellen, MOLINA'S (former) Payroll Administrator, has informed Plaintiffs that she processed new hires for the years of 2007 to 2009, and questioned management on why only Indian nationals were being hired in MOLINA'S IT Department.

c)   MOLINA provided employment benefits to employees of Indian descent who celebrated Indian holidays but denied American citizen employees the same or similar employment benefits.  For example, "Divali" is an Indian holiday that is of similar significance to Christmas in the United States.  MOLINA allowed its Indian staff to take a long lunch to celebrate Divali, after which the Indian employees did not return to work for the day.  Similarly situated employees did not receive similar benefits for traditional American holidays such as Christmas, Thanksgiving, or Fourth of July.  Nor were non-Indian employees afforded a benefit for Divali.  MOLINA'S Indian managers actively discouraged U.S. workers from celebrating U.S. holidays and traditions, such as Christmas, the Fourth of July and Thanksgiving, by assigning mandatory work that, in order to be timely completed, required work during holidays traditionally celebrated in America.  MOLINA'S Indian managers also discouraged in-office posters, pot lucks or other observations of holidays traditionally celebrated in America.

d)   MOLINA had a pattern and practice, through its management, in treating similarly situated employees differently based on race, ethnicity, and/or national origin.  For example,

-16-
**COMPLAINT**

MOLINA'S Indian managers would only publish the accomplishments of employees of Indian descent to senior management.  Though there were a number of accomplishments and completed projects by American employees, which were never published to senior management.  Indeed, the American employees were frequently required by management to assist the employees of Indian descent in performing their job duties, but this was never acknowledged to senior management.

e)   MOLINA had a pattern and practice of excluding employees of non-Indian descent from participating in the decision-making processes necessary to adequately perform essential job functions for the purpose of putting them at a disadvantage to the employees of Indian descent.  For example, all employees were present at staff meetings to discuss major projects and to "divvy up" these projects and other work.  The meetings were initially conducted in English to include all employees in the management deliberations and to allow all employees input into management decision-making, as well as to get information from the American employees.  However, on many occasions, the meeting would be conducted in the native language of the Indian employees with the practical effect being to exclude the American employees from further input or contribution in management decisions. Further, such conferences being conducted in the Indian employees' native language not only deprived the American employees of proper guidance to do their job; but also hindered the American employees' repose with management to assess the possibility of promotions.  Further, conducting these meetings and conferences in the Indian employees' native language provided these employees with an unfair advantage in knowing what the management team wanted.

f)   **Rahat Khan, an administrative assistant at MOLINA, has stated that MOLINA managers did not interview American citizens for jobs that were filled by Indian nationals.**

-17-

**COMPLAINT**

g)   DESAI told several employee recruiters, from outside the company, that he would speak only with job applicants who were Indian nationals.

h)   DESAI and his management team hire and promote *only Indian nationals* to management positions and other advanced positions, and intentionally excluded from consideration for hire and/or promotion all qualified employees who were American citizens and green card holders.

i)   A manager of Indian descent (Jayant Manahor) used profanity and sexual innuendos in a meeting while he was criticizing his staff. He was promoted. Plaintiffs are informed and believe that if a non-Indian manager had exhibited same behavior, he would have been fired.

j)   The incompetence and/or lack of knowledge by a manager of Indian descent was responsible for the Michigan health plan's database going down for a week. MOLINA'S losses for this downtime were significant. This "database administrator" manager was not fired because he was of Indian descent. However, a non-Indian "database administrator" (Lam Nguyen) who made mistakes that were not nearly as serious or as costly as the mistakes that led to the Michigan downtime was fired.

k)   DESAI wrote angry emails and was verbally abusive toward a non-Indian manager (Don Villanueva.). DESAI did not treat his managers of Indian descent the same way.

l)   MOLINA had a pattern and practice of discriminating against women and non-Indians. DESAI, and his Indian management team, would regularly exclude OEMS manager Eugenia Serpik, who is a Caucasian female, from things such as management meetings and interviewing new candidates for hiring in her own group. Soni would include only male management employees of Indian descent in these management meetings and interviews.

-18-
**COMPLAINT**

m)   Many of the H1-B Indian employees were permitted by DESAI to go on vacation to India for one month or more. Such conduct was against MOLINA policy as applied to U.S. workers.  Plaintiffs are informed and believe that exceptions in MOLINA policies were made for these employees of Indian descent.  Plaintiffs are further informed and believe that said exceptions have been made through management covering for these employees which may also have included misrepresenting the amount of leave time actually taken by these Indian employees.

n)   Plaintiffs, and other similarly situated employees at MOLINA, communicated many complaints about the discrimination in the MOLINA IT Department to Human Resources ("HR").  However, HR never investigated the complaints or rectified the issues.  Supriya Sood, MOLINA'S (former) Senior Vice-President of Human Resources, stated to Plaintiffs that her predecessor, Richard Hondel, informed her that there was illegal discrimination occurring in the IT Department but that John Molina, Chief Financial Officer, and Mario Molina, Chief Executive Officer, refused to allow any investigation into those circumstances.  Ms. Sood stated to Plaintiffs that she tried to conduct an investigation into the IT Department and discrimination complaints but the Molinas blocked her attempts to do so. John Molina stated to Ms. Sood and to Ms. Wittenberg, that "I don't like HR investigating because it is a waste of time."  The work environment in the IT Department was so hostile that it prompted several of MOLINA'S employees to leave voluntarily due to the discrimination, harassment, and non-responsiveness of HR.  These employees include, but are not limited to, Mike Vahklis, Ed Poman, Harvard Kinkead, and Leon Yao.  In October 2010, under the pressure of mounting complaints of illegal discrimination coming from the IT Department, MOLINA relented and allowed Ms. Sood and Ms. Wittenberg to conduct an investigation of the IT Department. After interviews with 160 IT employees, the investigation established that the IT Department had discriminated against past employees and present employees.  Despite this internal

-19-
**COMPLAINT**

finding, MOLINA refused to take any steps to prevent future discrimination or to protect the rights and safety of its employees.

o)    In mid-October 2009, DESAI, Joe White (MOLINA'S Executive Vice-President), and Laura Onufrock held a management meeting to discuss the operations of the IT Department. The financials for MOLINA'S first three quarters were very good. At that point, the financials for the 4th quarter were unknown. DESAI and Joe White decided to fire 40 U.S. workers to make room for 40 more Indian H1-B workers. Ms. Onufrock suggested that they instead cut back on the number of projects that were planned, if the only issue was to reduce labor costs, and reminded them of the high cost of Indian labor charged by COGNIZANT. DESAI and White responded, "Don't mind the cost."

56.    The Sarbanes-Oxley Act (hereafter "SOX") was passed by Congress to reduce fraud by publicly traded companies. To do this, SOX seeks to prevent material misrepresentations in the companies' statements to the public and to the government.

57.    SOX requires periodic reports (usually annually) to the government. The periodic reports must verify that no problems exist in the company's operations and/or accounting procedures. These reports must also include all material off-balance sheet liabilities, obligations or transactions. The reporting company is required to use/follow generally accepted accounting principles or other regulations to insure open and meaningful reporting.

58.    The annual report must show "controls" of problems that passed or failed. If the controls failed, then the company must show its attempts at mediation. SOX requires proof of controls and their effectiveness in the annual report.

59.    An example of "off-balance" sheet liabilities, obligations or transactions is the Health Insurance Portability and Accountability Act (hereafter "HIPAA"), which provides a

-20-

**COMPLAINT**

guarantee of privacy for protected health information of patients and insureds.  In short, HIPAA's privacy rule requires covered entities to notify individuals of uses of their protected health information. Covered entities must also keep track of disclosures of protected health information. The company must document privacy policies and procedures.  The company must also appoint a Privacy Official and a contact person responsible for receiving complaints and training all members of their workforce in procedures regarding protected health information.

60.     MOLINA and COGNIZANT are covered entities for SOX and HIPAA because they handle healthcare facility operations and record keeping for patients.

61.     In 2007 and into 2008, MOLINA learned of numerous material violations of HIPAA but did not take any action with respect to these violations.  MOLINA did not report this material deficiency and liability to any regulatory agency.  It specifically and intentionally excluded this information from the SOX annual report.

62.     Specifically, the HIPPA and SOX violations occurred when MOLINA and COGNIZANT published MOLINA'S patients' Protected Health Information (hereafter "PHI") TO THE WORLD, LITERALLY.  For example, when MOLINA'S IT Department runs a test on new software projects, the IT employees are required to "mask" the data embedded in the new software in order to protect privacy rights.  In violation of HIPPA mandates, MOLINA'S H1-B employees in the United States would, and still do, send patients' names, social security numbers, addresses, birth dates, and full medical files to vendors and other COGNIZANT employees in India.  Privacy rights do not exist in India.  Accordingly, when MOLINA'S U.S.-based H1-B employees transfer this sensitive and protected information to India, it becomes open to the public.  In turn, COGNIZANT contractors in India send the PHI back to various MOLINA offices throughout the United States for all of MOLINA employees to see, whether authorized or not.  Plaintiffs' supervisors and even

-21-
**COMPLAINT**

directors of MOLINA have told COGNIZANT'S and MOLINA'S upper management about these numerous and continuing HIPPA violations.  Neither COGNIZANT nor MOLINA cared.  The latest information available to Plaintiffs is that there is still no "masking" of PHI during data transfers.

63.    As stated above, SOX requires the annual report to contain proof of controls and their effectiveness.  In 2007, 2008 and 2009, Helga Gergen ("Gergen"), MOLINA'S Controller, refused requests for documentary proof of the controls in the Finance Department.  Gergen knew at the time of her refusal that the requests were related to compliance with SOX and that the information was required to be included in MOLINA'S annual report.  Gergen has hidden those facts from both internal and external auditors.

64.    According to Laura Onufrock, MOLINA'S (former) Manger of Budget and Regulatory Reports and Audits, including SOX reporting, other examples of MOLINA'S failure to report "off-balance" sheet liabilities, obligations or transactions were violations of various Internal Revenue Code sections, such as:

(a)    MOLINA'S refusal to create and maintain a Fixed Asset Report and the numerous failures to properly report the value of fixed assets in its annual tax returns.  For example, MOLINA owns real property, leaseholds and durable office equipment worth in excess of several millions of dollars.  MOLINA did not track these fixed assets.  There was no reliable record on depreciation or its impact on profits.  Instead, each year, MOLINA reports unsubstantiated numbers to state and federal taxing agencies;

(b)    In 2008, MOLINA purchased real property in New Mexico to build a new facility.  MOLINA was required to "depreciate" the new building in 2008, because "Phase I" of the building was completed in 2008.  Yet, MOLINA labeled the project as a

-22-
**COMPLAINT**

"leasehold improvement." Further, MOLINA began depreciating the whole project under a 10-year depreciation schedule, not the 40-year schedule as required by law and Generally Accepted Accounting Principles. Gergen knew of the above-described wrongful conduct but stated that "Management wants to leave it alone";

(c)   In 2010, MOLINA instructed Laura Onufrock to place the expenses of its outside charity, The Book Buddies, into the IT Department budget. The charity leased property in Signal Hill, California, that MOLINA had improved. But, MOLINA did not want to show the expenses on the charity's books. Rather, MOLINA tried to expense the costs of the charity to the IT Department budget.

65.   After MOLINA terminated the 40 U.S. workers on January 14, 2010, it posted job openings within the IT Department and on its own website for the very same positions that MOLINA claimed to be "eliminated" on January 14, 2010. There were three openings that matched exactly the positions that two newly terminated employees held - Kristine Pham and EDWARD DUONG. These positions were not offered to Pham and DUONG prior to the layoff. The positions were listed for the Long Beach location but were recently changed to the New Mexico location after Kristine Pham notified HR that she was revoking her severance contract.

66.   Similarly, Plaintiff DE HILSTER saw a job opening posted on MOLINA'S website for a "Programmer Analyst" after the layoff that matched the position DE HILSTER held before the layoff. After DE HILSTER applied for that position, MOLINA'S HR informed him that it was no longer available. Plaintiffs are informed and believe that a person of Indian descent filled this position.

67.   When Plaintiffs went to speak to MOLINA'S HR regarding the inappropriate treatment by Sriram Vasaduven (a manager of Indian descent), the Vice-President of HR at the time,

-23-

**COMPLAINT**

Rich Hondel, spoke frankly to the Plaintiffs.  Mr. Hondel confided to the Plaintiffs that he was

"surprised" by the inordinate amount of Indian nationals holding positions in the IT Department. He

also stated that he did not think it was a good idea for MOLINA to allow that.  However, nothing

was done about it. Mr. Hondel also informed his successor,  Supriya Sood, MOLINA'S Senior Vice-

President of Human Resources, that there was various illegal discrimination in the IT Department

involving the hiring of Indian nationals and excluding other national origins but MOLINA did not

want an investigation done.

68.     On January 12, 2010, Plaintiffs spoke with their supervisor and manager about

the national origin discrimination and about the fact that privileged and HIPPA protected material

was being wrongfully shared with Indian nationals outside the control and network of MOLINA.

Such conduct is believed to be a violation of federal law and an invasion of the patient's privacy as

Plaintiffs pointed out at the time. The MOLINA manager accepted the Plaintiffs' complaints and

acknowledged that the Plaintiffs were going to approach federal authorities to complain.  On January

14, 2010, the Plaintiffs were fired.

69.     After Plaintiffs' termination, Plaintiffs, and each of them, filed a complaint

with the Department of Fair Employment and Housing.  The Department of Fair Employment and

Housing has issued a "Notice of Case Closure" advising Plaintiffs of their right to bring this action in

civil court.

70.     Plaintiffs are informed and believe, and on that basis allege, that shortly after

Plaintiffs received their "Right to Sue" letters, DESAI "resigned" from employment with MOLINA.

Plaintiffs are further informed and believe that after DESAI'S departure from MOLINA, Soni also

terminated his employment with MOLINA.

-24-
**COMPLAINT**

71.     Plaintiffs are informed and believe, and on that basis allege, that after DESAI departed from MOLINA, he was offered employment with COGNIZANT.

72.     MOLINA has a documented history of its policy and practice to reward managers who harm MOLINA employees and to ignore the rights and safety of others. Plaintiffs have been told and believe and based on such information and belief, allege that MOLINA'S oppression and malice toward employees is not an accident, as the following facts demonstrate:

(a)  In or around 2007 and 2008, MOLINA fired approximately 100 American workers in various states to make room for over 100 Indian contractors in India to handle all of MOLINA'S U.S. business operations involving MEDICARE and MEDICAID, and then billed the U.S. government for the cost of the Indian labor;

(b)  Mark Andrews, Esq, was General Counsel and Secretary for MOLINA until June of 2010.  During his tenure there were complaints against him of sexual harassment of a female employee.  Yet, MOLINA expressly refused to allow an investigation into the many allegations.  Finally, in June 2010, MOLINA could no longer deny the investigation when, among the complainers, was Lisa Rubino, MOLINA'S California Plan President, Kelly Ryan, Esq , an In-House Attorney for MOLINA, Loren Lovel and Ronda Mock, both of whom worked in MOLINA'S legal department.  Among the witnesses was another in-house attorney at MOLINA.  An outside investigator from San Francisco, Rebecca Speer, was hired to conduct an investigation. Ms. Speer reported that the facts established harassment directed at women.  Initially, MOLINA'S senior management refused to act to protect the harassed women.  Eventually, MOLINA asked Mr. Andrews to leave with a severance package.  According to the 10-K report MOLINA filed with the Security and Exchange

-25-
**COMPLAINT**

Exhibit 1, Page 30

Commission, MOLINA paid Ms. Andrews over $1.5 million dollars for his wrongful conduct;

(c)   In December 2010, John Molina informed Supriya Sood, (former) Senior Vice-President of HR, that a female employee was spreading rumors about a sexual affair between John Molina and the female employee.  John Molina wanted said female employee terminated from her job for (potentially) complaining about sexual harassment.  Ms. Sood responded that this was a serious charge, potentially in violation of the law, and should be investigated in order to protect the corporation.  John Molina refused to allow Ms. Sood to conduct an investigation.  Ms. Sood referred the matter to the Legal Department and was fired shortly thereafter.  Plaintiffs are informed and believe that the female employee was also fired.

(d)   Juan J. Orellano, MOLINA'S Vice-President of Communications disciplined Javier Mendoza, another MOLINA employee, who then filed a retaliation claim for his testifying in a race and sexual harassment case brought by a female employee against MOLINA.  John and Mario Molina demanded that Javier Mendoza be fired for filing a civil rights complaint against MOLINA.

(e)   John Molina has expressed his displeasure with the disabled employees of MOLINA.  For example, when a disabled employee in Washington, D.C., asked for reasonable accommodation, John Molina was heard to say, "I don't care." And the disabled employee was thereafter fired.

(f)   Hilga Gergen, MOLINA'S Controller, has been reported to have a violent temper that has resulted in uncontrolled rants and rages against other employees.  For example, during such rants, Ms. Gergen's face turns red, she yells at the top of her

**COMPLAINT**

lungs, and pulls out her hair, literally.  Her violent behavior and hostile workplace are well known to MOLINA'S senior management and to John Molina and Mario Molina because Ms. Gergen is a personal friend of theirs.  In August to September 2010, Josephine Wittenberg conducted an investigation of the hostile workplace created by Ms. Gergen.  The investigation established that:

- racial comments by Ms. Gregen and others were allowed against African-American employees;

- Ms. Gergen knew of the racial comments by others but did nothing to stop the illegal conduct;

- Once, Germane Daniels, an African American employee, wore a black and white outfit to work.  Gergen stated to her that, "You must be a single stuffed Oreo." On the same day, Wanda Maxwell, an African American employee, also wore a black and white outfit to work, Gergen stated to her that, "You must be a double stuffed Oreo."

- Racial words such a "cracker", "slave", "nigger" are used repeatedly by Darlene Williams, the payroll supervisor, hired by Ms. Gergen specifically to supervise Ms. Maxwell and Daniels;

- After Maxwell and Daniels complained of the discrimination, Ms. Gergen hired two new payroll processors who are not African American to replace Maxwell and Daniels.  Then, Darlene Williams told Maxell and Daniels that, "We are taking your two black faces out and replacing them with two new ones."

- Most of the employees under the Controller's review fear retaliation from her if they oppose her conduct;

-27-
**COMPLAINT**

- MOLINA protects Ms. Gergens from any consequences that of her inappropriate and harassing conduct;

- Ms. Gergens used her title and personal affiliation with the Molinas to affect the work environment in a hostile manner.

(g) After an investigation substantiated the complaints of race and hostile workplace discrimination by Ms. Gergen, Ms. Wittenberg met with Joe White, Executive Vice-President, who agreed to remove Gergen's oversight of all payroll functions and deny her a bonus, and to issue a written warning to be placed into Ms. Gergen's personnel file. Subsequently, MOLINA overrode the decision of Ms. Wittenberg and Mr. White. Gergen has returned as the manager of the payroll department and there was no written warning placed in Gergen's file. In February 2011, MOLINA gave Gergen all of her 2010 bonus. Josephine Wittenberg asked to discuss the issuance of the bonus to Gergen with Joe White. The next day, March 2, 2011, Josephine Wittenberg was fired. Josephine Wittenberg was, at the time of her termination, investigating the Legal Department for nepotism.

(h) From October 2010 to January 2011, due to numerous complaints of racial discrimination in the IT Department, an investigation and interviews of 160 employees were conducted. In October 2010, Ms. Wittenberg and Ms. Sood conducted the investigation into the IT Department's issues and found facts to establish the existence of a hostile workplace and illegal employment discrimination based on race and national origin. The findings were that the IT Department for the past several years had been a hostile workplace for Americans and green card holders, who also suffered from discrimination. The findings were reported along with

-28-

**COMPLAINT**

recommendations for training to prevent further discrimination. MOLINA'S upper management became upset with Ms. Wittenberg and Ms. Sood, who blamed them for instigating the workplace unrest.

(i)   In January 2011, John Molina told Ms. Sood that he wanted to convert a job position to exempt status. Ms. Sood researched his request and determined that the job was non-exempt in nature. MOLINA demanded that Ms. Sood change the job description illegally.

### FIRST CAUSE OF ACTION
**[National Origin Discrimination]**
**[Violation of Calif. Constitution § 8, Civil Code, § 51]**
**[All plaintiffs against COGNIZANT and DESAI]**

73.   Plaintiffs, and all those similarly situated, reallege and incorporate herein by reference each and every allegation contained in each and every paragraph above, inclusive.

74.   Section 8 of the California Constitution provides that "A person may not be disqualified from entering or pursuing a business, profession, vocation or employment because of . . . national origin or ethnic origin." Likewise, *Civil Code*, section 51, states that it is illegal in California for a business to deny to any individual "the full and equal accommodations, advantages, facilities, privileges, or services" of that business establishment because of ancestry or national origin, among other reasons.

75.   The facts alleged in paragraphs twenty-six (26) through seventy-two (72) constitute violations of the California Constitution, Section 8, and *Civil Code*, section 51, in that Defendants, and each of them, discriminated against Plaintiffs, and all those similarly situated, on the basis of their national origin or ethnic origin. Furthermore, Defendants, and each of them, refused to

-29-
**COMPLAINT**

offer to Plaintiffs and all similarly situated persons, "the full and equal accommodations, advantages, facilities, privileges, or services" of that business establishment.

76.    COGNIZANT, DESAI and MOLINA willfully conspired and agreed among themselves to discriminate against Plaintiffs and those similarly situated on the basis of national or ethnic origin because they did not want to employ Americans or green card holders.

77.    In furtherance of the conspiracy, COGNIZANT convinced MOLINA and DESAI that they should no longer employ Plaintiffs, and that they should use COGNIZANT'S H1-B Indian contractors to perform the work Plaintiffs were performing.  COGNIZANT filed all of the necessary Labor Condition Applications with the Department of Labor in order to import the H1-B contractors it promised to DESAI and MOLINA.  To successfully do so, COGNIZANT had to submit false information to the Department of Labor to ensure approval.  In turn, on information and belief, DESAI received clandestine financial incentives in the form of kickbacks and other compensation to encourage MOLINA to employ COGNIZANT'S H1-B contractors.  Additionally, MOLINA, COGNIZANT and DESAI desired and agreed to create an Indian-dominated department because it would be easier for defendants, and each of them, to command a workforce that would not demand compensation for overtime hours nor complain about the hostile work place. MOLINA ratified DESAI'S conduct and/or received and retained the benefits of the conduct.  After COGNIZANT received approval for the importation of H1-B contractors, MOLINA replaced Plaintiffs with said contractors at DESAI'S directive.  The H1-B contractor that replaced Plaintiffs were less qualified to perform the jobs that Plaintiffs had been performing.

78.    As a direct and proximate result of the discrimination described in this cause of action, Plaintiffs, and all those similarly situated, have suffered lost wages and other benefits of employment in an amount to be proven at trial, including, but not limited to, tripling of actual

**COMPLAINT**

Exhibit 1, Page 35

damages pursuant to *Civil Code* section 52, subdivision (a) and (h).

79.     As a further direct and proximate result of Defendants' unlawful acts, and each of them, Plaintiffs, and all those similarly situated, have sustained serious personal injuries, including, but not limited to, emotional distress, pain and suffering, all in an amount to be proven at trial, including, but not limited to, tripling of actual damages pursuant to *Civil Code* section 52, subdivision (a) and (h).

80.     Plaintiffs, and all those similarly situated, allege that the conduct of Defendants, and each of them, was malicious, oppressive or fraudulent, or taken in conscious disregard of rights, health, safety, and economic condition of Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages.

### SECOND CAUSE OF ACTION
**[Intentional Infliction of Emotional Distress]**
**[All plaintiffs against COGNIZANT and DESAI, and Plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, and KAREN KU against MOLINA]**

81.     Plaintiffs, and all those similarly situated, reallege and incorporate herein by reference each and every allegation contained in each and every paragraph above, inclusive.

82.     The facts alleged in paragraphs twenty-six (26) through seventy-two (72) constitute defendants', and each of them, extreme and outrageous behavior.  At all relevant times herein, Defendants, and each of them, were aware of Plaintiffs' concern for their emotional needs, financial needs, medical needs, employment conditions and the welfare of their family.  The conduct of Defendants, and each of them, as hereinabove alleged was intentional and malicious, and was done for the purpose of causing Plaintiffs, and all those similarly situated, to suffer humiliation, mental anguish, and severe emotional and physical distress.  The conduct of Defendants, and each of them, was done with the

-31-
**COMPLAINT**

knowledge that it would cause severe emotional distress and was done with a wanton and reckless

disregard of the consequences to Plaintiffs, and all those similarly situated. The conduct of Defendants,

and each of them, was extreme and outrageous.

83.     COGNIZANT, DESAI and MOLINA willfully conspired and agreed among

themselves to intentionally inflict emotional distress upon Plaintiffs.

84.     In furtherance of the conspiracy, COGNIZANT convinced MOLINA and

DESAI that they should no longer employ Plaintiffs, and that they should use COGNIZANT'S H1-B

Indian contractors to perform the work Plaintiffs were performing. COGNIZANT filed all of the

necessary Labor Condition Applications with the Department of Labor in order to import the H1-B

contractors it promised to DESAI and MOLINA. To successfully do so, COGNIZANT had to

submit false information to the Department of Labor to ensure approval. In turn, on information and

belief, DESAI received clandestine financial incentives in the form of kickbacks and other

compensation to encourage MOLINA to employ COGNIZANT'S H1-B contractors. Additionally,

MOLINA, COGNIZANT and DESAI desired and agreed to create an Indian-dominated department

because it would be easier for defendants, and each of them, to command a workforce that would

not demand compensation for overtime hours nor complain about the hostile work place. MOLINA

ratified DESAI'S conduct and/or received and retained the benefits of the conduct. After

COGNIZANT received approval for the importation of H1-B contractors, MOLINA replaced

Plaintiffs with said contractors at DESAI'S directive. The H1-B contractor that replaced Plaintiffs

were less qualified to perform the jobs that Plaintiffs had been performing.

85.     As a direct and proximate result of the conduct of Defendants, and each of

them, Plaintiffs, and all those similarly situated, have suffered lost wages and other benefits of

employment in an amount to be proven at trial.

**COMPLAINT**

86.     As a further direct and proximate result of the acts of Defendants, and each of them, Plaintiffs, and all those similarly situated, have sustained extreme emotional distress and pain and suffering all in an amount to be proven at trial.

87.     Plaintiffs, and all those similarly situated, allege that the conduct of the Defendants, and each of them,  as alleged hereinabove, was malicious, oppressive or fraudulent, or taken in conscious disregard to Plaintiffs' rights, health, safety, and economic condition, thereby entitling Plaintiffs, and all those similarly situated, to an award of punitive damages.

### THIRD CAUSE OF ACTION
**[Wrongful Employment Termination in Violation of a Public Policy]**
**[All plaintiffs against COGNIZANT and DESAI, and Plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, and KAREN KU against MOLINA]**

88.     Plaintiffs reallege and incorporate herein by reference each and every allegation contained in each and every paragraph above, inclusive.

89.     Section 8 of the California Constitution and California *Government Code*, section 12920, et. seq. make it a civil right to be free from discrimination, including discrimination based on race, national origin, retaliation and/or hostile work place, as well as, *Civil Code*, section 51, and the Immigration and Nationalization Act, section 101, subdivision (h) and 8 C.F.R. Section 214, prohibit and render actionable any conduct of discriminating or retaliating against any individual/employee because of the individual's ancestry, national origin or ethnic origin.  Further, the Immigration and Nationalization Act, section 101, subdivision (h) and 8 C.F.R. Section 214, prohibit an employer's conduct in using the H1-B visa category as a means to import foreign laborers to replace qualified, currently-employed American employees. *Labor Code* sections 510 and 512 provides that it is public policy that an employer must pay overtime to employees and must allow meal & break times for employees.

-33-
**COMPLAINT**

Exhibit 1, Page 38

90.     The facts alleged in paragraphs twenty-six (26) through seventy-two (72),
establishes Defendants, and each of them, engaged in conduct that violated the public policies set
forth in the various statutes and constitutional provisions.  Plaintiffs, and each of them, allege that
COGNIZANT became their employer through the tripartite conspiracy of DESAI, MOLINA and
COGNIZANT, when each shared the control of the means of employment and the very jobs held by
the plaintiffs.  COGNIZANT actively participated in the control of plaintiff's employment. For
example, the defendants, and each of them, controlled plaintiff's wages by insisting that no overtime
pay be issued to Plaintiffs and by insisting that no overtime pay be issued to the H1B Indian
contractors.  Defendants, and each of them controlled Plaintiff's work schedules in two (2) ways: (a)
COGNIZANT controlled Plaintiff's job duties by requiring the plaintiff's to train COGNIZANT H1B
Indian contractors, which was COGNIZANT'S responsibility; and (b) Plaintiffs had no work to do
unless it was supplied by COGNIZANT. Plaintiffs were required to attend mandatory meetings
called and run by COGNIZANT. In the COGNIZANT run meetings, plaintiffs were ordered to
perform tasks that were not in MOLINA'S best interest, but did benefit COGNIZANT.  Plaintiff's
MOLINA supervisor, Eugenia Serpik,_ asked the Plaintiffs for information of COGNIZANT'S work
orders to the plaintiff. The close relationship of MOLINA with COGNIZANT became so
intermingled that Plaintiffs wondered among themselves who they worked for – COGNIZANT or
MOLINA. Defendants, and each of them, refused to consider or allow Plaintiffs to apply for work
with the defendants because of Plaintiffs' national origin.  Also, Defendants, and each of them,
controlled the decision to remove Plaintiffs from employment.

91.     COGNIZANT, DESAI and MOLINA willfully conspired and agreed among
themselves to replace Plaintiffs with COGNIZANT'S H1-B Indian contractors.

92.     In furtherance of the conspiracy, COGNIZANT convinced DESAI that he and MOLINA should no longer employ Plaintiffs, and that they should use COGNIZANT'S H1-B Indian contractors to perform the work Plaintiffs were performing.  COGNIZANT filed all of the necessary Labor Condition Applications with the Department of Labor with falsified information in order to import the H1-B Indian contractors to replace Plaintiffs as agreed with DESAI and MOLINA.  In turn, on information and belief, DESAI received clandestine financial incentives in the form of kickbacks and other compensation to encourage MOLINA to employ COGNIZANT'S H1-B Indian contractors.  Thus, COGNIZANT was able to control the daily activities of Plaintiffs' employment.

93.     As a direct and proximate result of the conduct of Defendants, and each of them, Plaintiffs have suffered lost wages and other benefits of employment in an amount to be proven at trial.

94.     As a further direct and proximate result of the acts of Defendants, and each of them, Plaintiffs have sustained emotional distress and pain and suffering all in an amount to be proven at trial.

95.     Plaintiffs allege that the conduct of Defendants, and each of them, was malicious, oppressive or fraudulent, or taken in conscious disregard of rights, health, safety, and economic condition of Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### [Negligence]
**[All plaintiffs against COGNIZANT and DESAI, and Plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, and KAREN KU against MOLINA]**

96.     Plaintiffs reallege and incorporate herein by reference each and every allegation contained in each and every paragraph above, inclusive.

-35-
**COMPLAINT**

97.     The facts alleged in paragraphs twenty-six (26) through seventy-two (72) constitute negligence by Defendants, and each of them, who owed Plaintiffs a legal duty not to cause them foreseeable harm.  The legal duty arises from both case law and from various statutes intended to protect the Plaintiffs from the type of harm suffered.

98.     Defendants, and each of them, breached the legal duty owed to the Plaintiffs by its conduct, including, but not limited to, the conduct detailed in paragraphs twenty-six (26) through seventy-two (72) above.

99.     Defendants, and each of them, breach of the legal duty owed to Plaintiffs was the direct cause of harm to the Plaintiffs.

100.    COGNIZANT, DESAI and MOLINA willfully conspired and agreed among themselves to replace Plaintiffs with COGNIZANT'S H1-B contractors.

101.    In furtherance of the conspiracy, COGNIZANT convinced DESAI that he should no longer employ Plaintiffs, and that he should use COGNIZANT'S H1-B contractors to perform the work Plaintiffs were performing.  The H1-B contractors that replaced Plaintiffs were less qualified to perform the jobs that Plaintiffs had been performing.

102.    As a direct and proximate result of the conduct of Defendants, and each of them, Plaintiffs have suffered lost wages and other benefits of employment in an amount to be proven at trial.

103.    As a further direct and proximate result of the acts of Defendants, and each of them, Plaintiffs have sustained emotional distress and pain and suffering all in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**[Tortious Interference With a Contract]**
**[All plaintiffs against COGNIZANT and DESAI]**

-36-
**COMPLAINT**

104.     Plaintiffs reallege and incorporate herein by reference each and every allegation contained in each and every paragraph above, inclusive.

105.     The facts alleged in paragraphs twenty-six (26) through seventy-two (72) constitute COGNIZANT'S tortious interference with the contract between MOLINA and Plaintiffs.

106.     Plaintiffs had an enforceable contractual employment relationship and expectancy for a continued employment relationship with MOLINA.

107.     COGNIZANT knew of Plaintiffs' contractual relationship and expectancy of continuing said relationship with MOLINA.  COGNIZANT intentionally interfered with Plaintiffs' contract, business relation and expectancy for a continued relationship, by making false statements of fact to MOLINA regarding Plaintiffs' professional ability and COGNIZANT'S legal importation of foreign labor on MOLINA'S behalf.  COGNIZANT'S false statements of fact were intended to, and did, induce MOLINA to breach its business relationship with Plaintiffs.

108.     COGNIZANT and DESAI willfully conspired and agreed among themselves to replace Plaintiffs with COGNIZANT'S H1-B contractors.

109.     In furtherance of the conspiracy, COGNIZANT convinced MOLINA and DESAI that they should no longer employ Plaintiffs, and that they should use COGNIZANT'S H1-B Indian contractors to perform the work Plaintiffs were performing.  COGNIZANT filed all of the necessary Labor Condition Applications with the Department of Labor in order to import the H1-B contractors it promised to DESAI and MOLINA.  To successfully do so, COGNIZANT had to submit false information to the Department of Labor to ensure approval.  In turn, on information and belief, DESAI received clandestine financial incentives in the form of kickbacks and other compensation to encourage MOLINA to employ COGNIZANT'S H1-B contractors.  Additionally,

-37-
**COMPLAINT**

MOLINA, COGNIZANT and DESAI desired and agreed to create an Indian-dominated department because it would be easier for defendants, and each of them, to command a workforce that would not demand compensation for overtime hours nor complain about the hostile work place. MOLINA ratified DESAI'S conduct and/or received and retained the benefits of the conduct.  After COGNIZANT received approval for the importation of H1-B contractors, MOLINA replaced Plaintiffs with said contractors at DESAI'S directive.  The H1-B contractor that replaced Plaintiffs were less qualified to perform the jobs that Plaintiffs had been performing.

110.    COGNIZANT'S wrongful conduct has caused Plaintiffs to suffer damages as will be proven at trial.  COGNIZANT'S purpose was to discredit and remove Plaintiffs from their employment so that COGNIZANT could supply MOLINA with COGNIZANT'S own foreign labor instead.  COGNIZANT intended to and did profit from the replacement of the plaintiffs with the HI-B contractors it supplied to MOLINA.

111.    As a direct and proximate result of COGNIZANT'S conduct, Plaintiffs have suffered lost wages and other benefits of employment in an amount to be proven at trial.

112.    As a further direct and proximate result of COGNIZANT'S acts, Plaintiffs have sustained emotional distress and pain and suffering all in an amount to be proven at trial.

113.    Plaintiffs allege that the conduct of COGNIZANT was malicious, oppressive or fraudulent, or taken in conscious disregard of rights, health, safety, and economic condition of Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages.

### SIXTH CAUSE OF ACTION
**[Violation of the Unfair Business Practices Act]**
**[All plaintiffs against COGNIZANT and DESAI, and Plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, and KAREN KU against MOLINA]**

-38-
**COMPLAINT**

114.     Plaintiffs reallege and incorporate herein by reference each and every allegation contained in each and every paragraph above, inclusive.

115.     The *Business & Professions Code* Section 17200 prohibits any and all means or acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [law]."

116.     Defendants, and each of them, engaged in unfair competition by conduct that included unlawful, unfair, fraudulent, deceptive, untrue or misleading statements and certifications, and other acts prohibited by law, as described in paragraphs twenty-six (26) through seventy-two (72) above.  Plaintiffs allege that Defendants' violations of both Section 8 of the California Constitution, *Government Code*, section 12920, et. seq., fraud in the inducement, violations of *Labor Code*, sections 510 and 512, and *Civil Code*, section 51, constitute unlawful and unfair business practices.  Further unfair competition includes, but is not limited to, COGNIZANT'S intentional interference with Plaintiffs' contract, business relation and expectancy of a continued business relationship with MOLINA by making false statements of fact to MOLINA regarding Plaintiffs' professional ability, and Defendants', and each of them, importation of foreign labor to replace Plaintiffs.

117.     COGNIZANT, DESAI and MOLINA willfully conspired and agreed among themselves to replace Plaintiffs with COGNIZANT'S H1-B contractors.

118.     In furtherance of the conspiracy, COGNIZANT convinced MOLINA and DESAI that they should no longer employ Plaintiffs, and that they should use COGNIZANT'S H1-B Indian contractors to perform the work Plaintiffs were performing.  COGNIZANT filed all of the necessary Labor Condition Applications with the Department of Labor in order to import the H1-B

-39-

**COMPLAINT**

contractors it promised to DESAI and MOLINA.  To successfully do so, COGNIZANT had to submit false information to the Department of Labor to ensure approval.  In turn, on information and belief, DESAI received clandestine financial incentives in the form of kickbacks and other compensation to encourage MOLINA to employ COGNIZANT'S H1-B contractors.  Additionally, MOLINA, COGNIZANT and DESAI desired and agreed to create an Indian-dominated department because it would be easier for defendants, and each of them, to command a workforce that would not demand compensation for overtime hours nor complain about the hostile work place. MOLINA ratified DESAI'S conduct and/or received and retained the benefits of the conduct.  After COGNIZANT received approval for the importation of H1-B contractors, MOLINA replaced Plaintiffs with said contractors at DESAI'S directive.  The H1-B contractor that replaced Plaintiffs were less qualified to perform the jobs that Plaintiffs had been performing.

119.   As a direct and proximate result of the conduct of Defendants, and each of them, Plaintiffs have suffered lost wages and other benefits of employment in an amount to be proven at trial.

120.   As a further direct and proximate result of the acts of Defendants, and each of them, Plaintiffs have sustained emotional distress and pain and suffering all in an amount to be proven at trial.

121.   Plaintiffs allege that the conduct of Defendants, and each of them, was malicious, oppressive or fraudulent, or taken in conscious disregard of rights, health, safety, and economic condition of Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### [Fraud in the Inducement]
**[Plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, and KAREN KU against MOLINA]**

Exhibit 1, Page 45

122.    Plaintiffs reallege and incorporate herein by reference each and every allegation contained in each and every paragraph above, inclusive.

123.    On January 14, 2010, Plaintiffs were informed by MOLINA, through DESAI, that they were being terminated because MOLINA'S financial underperformance in the 4th quarter of 2009 resulted in its inability to keep Plaintiffs employed.

124.    Plaintiffs were further informed that they were required to sign a severance agreement right there and then.  Plaintiffs were also informed that they would not receive their final wages unless they signed a severance agreement, releasing MOLINA from all liability related to Plaintiffs' employment.

125.    MOLINA knew that the statements described in paragraph 123 and 124 were untrue at the time that it made them to the Plaintiffs.  MOLINA stated the known false facts in order to induce the Plaintiffs to enter into a severance agreement wherein the Plaintiffs would release MOLINA from liability for greater illegal activities unknown to the Plaintiffs at that time.  Believing that MOLINA'S claims were true, and in reasonable reliance on the veracity of their employer's statements, Plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, and KAREN KU were induced by MOLINA'S intentionally false statements of fact to execute the severance agreement presented by MOLINA.

126.    The true facts known to MOLINA were: (1) that MOLINA had increased its income in 2009 by about $500 million, and had not suffered any of the financial losses claimed on January 14, 2010; (2) that MOLINA did not eliminate Plaintiffs' positions, but instead replaced Plaintiffs with workers of Indian descent who held an H1-B visa;  (3) that MOLINA posted several job openings in the very same positions that MOLINA claimed to be eliminated immediately after the layoff; (4) that MOLINA staffed those open positions with workers of Indian descent, who were

-41-
**COMPLAINT**

provided by COGNIZANT; (5) that MOLINA could not have eliminated the positions stated because MOLINA'S HIPPA-compliance program would then cease to exist, and MOLINA would be in violation of federal law; and (6) that Plaintiffs were not required to execute any severance agreements, and were entitled to receive their final wages by law.

127.    Had Plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, and KAREN KU known the true facts, they would not have executed the severance agreements.

128.    As a direct and proximate result of MOLINA'S fraudulent conduct, the terms of the severance agreements executed by Plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, and KAREN KU cannot be enforced.  Plaintiffs, and each of them, have communicated in writing to MOLINA their revocation of the severance agreement.

129.    As a further direct and proximate result of MOLINA'S conduct, Plaintiffs have suffered lost wages and other benefits of employment in an amount to be proven at trial.

130.    As a further direct and proximate result of MOLINA'S acts, Plaintiffs have sustained emotional distress and pain and suffering all in an amount to be proven at trial.

131.    Plaintiffs allege that the conduct of MOLINA was malicious, oppressive or fraudulent, or taken in conscious disregard of rights, health, safety, and economic condition of Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### [Age Discrimination]
### [Violation of Gov. Code, § 12940, subd. (j)]
### [Plaintiffs TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, BONITA SHOK and KAREN KU against MOLINA]

-42-
**COMPLAINT**

132.    Plaintiffs reallege and incorporate herein by reference each and every allegation contained in each and every paragraph above, inclusive.

133.    *Government Code* section 12940, subdivision (j), provides that it is an unlawful employment practice for an employer, because of the person's age and/or national origin, to harass the employee. An entity shall take all reasonable steps to prevent the harassment from occurring.

134.    The facts alleged in paragraphs twenty-six (26) through seventy-two (72) constitute violations of the Fair Employment and Housing Act, *Government Code* section 12940, subdivision (j) in that MOLINA discriminated against plaintiffs TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, BONITA SHOK and KAREN KU on the basis of their age.  Furthermore, MOLINA subjected plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, BONITA SHOK, and KAREN KU to harassment on the basis of their age thereby creating a hostile, offensive and intimidating work environment.

135.    As a direct and proximate result of the employment discrimination described in this cause of action, plaintiffs TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, BONITA SHOK and KAREN KU have suffered lost wages and other benefits of employment in an amount to be proven at trial.

136.    As a further direct and proximate result of MOLINA'S unlawful acts, plaintiffs TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, BONITA SHOK and KAREN KU have sustained serious personal injuries, including, but not limited to, emotional distress, pain and suffering, all in an amount to be proven at trial.

-43-

**COMPLAINT**

137.   Plaintiffs allege that the conduct of MOLINA was malicious, oppressive or fraudulent, or taken in conscious disregard of rights, health, safety, and economic condition of Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages.

## NINTH CAUSE OF ACTION
**[Failure to Take all Reasonable Steps to Prevent Discrimination]**
**[Violation of Gov. Code, § 12940, subd. (k)]**
**[Plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, BONITA SHOK, and KAREN KU against MOLINA]**

138.   Plaintiffs reallege and incorporate herein by reference each and every allegation contained in each and every paragraph above, inclusive.

139.   *Government Code* section 12940, subdivision (k), states that it is an unlawful employment practice for an employer to "fail to take all reasonable steps necessary to prevent discrimination harassment from occurring."

140.   The facts alleged in paragraphs twenty-six (26) through seventy-two (72) constitute violations of the Fair Employment and Housing Act for failure to take all reasonable steps necessary to prevent discrimination from occurring in violation of *Government Code* section 12940, subdivision (k), of the Fair Employment and Housing Act.

141.   As a direct and proximate result of MOLINA'S discrimination in the form of failing to take all reasonable steps to prevent the discrimination described in this cause of action, plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, BONITA SHOK, and KAREN KU have suffered lost wages and other benefits of employment in an amount to be proven.

142.   As a further direct and proximate result of MOLINA'S acts, plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY,

-44-
**COMPLAINT**

STEVEN MO, BONITA SHOK, and KAREN KU have sustained emotional distress and pain and suffering all in an amount to be proven.

143.    Plaintiffs allege that the conduct of MOLINA was malicious, oppressive or fraudulent, or taken in conscious disregard of rights, health, safety, and economic condition of Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages.

**TENTH CAUSE OF ACTION**
**[Retaliation]**
**[Violation of Gov. Code, § 12940, subd. (h)]**
**[Plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, BONITA SHOK, and KAREN KU against MOLINA]**

144.    Plaintiffs reallege and incorporate herein by reference each and every allegation contained in each and every paragraph above, inclusive.

145.    *Government Code* section 12940, subdivision (h), provides that it is an unlawful employment practice for an employer or any person, to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under the Fair Employment and Housing Act.

146.    The facts alleged in paragraphs twenty-six (26) through seventy-two (72) constitute violations of the Fair Employment and Housing Act, Government Code section 12940, subdivision (f), in that MOLINA further discriminated against plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, BONITA SHOK, and KAREN KU when they opposed MOLINA'S illegal and/or harassing conduct. In retaliation to Plaintiffs' opposition, MOLINA changed its employment benefits causing a material alteration in employment conditions; then, MOLINA terminated plaintiff PARTHA CHOUNDRY,

-45-
**COMPLAINT**

TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, BONITA SHOK, and KAREN KU'S employment.

147.    As a direct and proximate result of the employment discrimination described in this cause of action, Plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, BONITA SHOK, and KAREN KU have suffered lost wages and other benefits of employment in an amount to be proven at trial.

148.    As a further direct and proximate result of MOLINA'S unlawful acts, plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, BONITA SHOK, and KAREN KU have sustained serious personal injuries, including, but not limited to, emotional distress, pain and suffering, all in an amount to be proven at trial.

149.    Plaintiffs allege that the conduct of MOLINA was malicious, oppressive or fraudulent, or taken in conscious disregard of rights, health, safety, and economic condition of Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages.

## ELEVENTH CAUSE OF ACTION
### [Violation of Labor Code section 1102.5]
**[Plaintiffs PARTHA CHOUNDRY, TIM NGUYEN, JAMES NGUYEN, EDWARD DUONG, ISMAIL GUZEY, STEVEN MO, BONITA SHOK, and KAREN KU against MOLINA]**

150.    Plaintiffs reallege and incorporate herein by reference each and every allegation contained in each and every paragraph above, inclusive.

151.    *Labor Code* section 1102.5 provides that an employer may neither retaliate against an employee who reports to a governmental agency his/her reasonable belief that the employer violated state or federal laws nor may the employer retaliate against the employee who refused to participate in an activity that the employee reasonably believes would result in violation of state or federal law.

-46-
**COMPLAINT**

Exhibit 1, Page 51

the applicable legal rate, including, but not limited to, tripling of actual damages pursuant to *Civil Code* section 52, subdivision (a) and (h).

2.    As to the 1st, 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th and 12th causes of action, order Defendants, and each of them, respectively, to pay compensatory damages to Plaintiffs, and each of them, to compensate for the emotional distress they suffered as a direct and proximate result of Defendants' unlawful conduct, according to proof, including, but not limited to, tripling of actual damages pursuant to *Civil Code* section 52, subdivision (a) and (h).

3.    As to the 1st, 2nd, 3rd, 5th, 6th, 7th, 8th, 9th, 10th, 11th and 12th causes of action, order Defendants, and each of them, respectively, to pay punitive damages to Plaintiffs, and each of them, to compensate for the malicious, fraudulent and oppressive conduct of Defendants, according to proof.

4.    As to the 1st, 2nd, 3rd, 5th, 6th, 7th, 8th, 9th, 10th, 11th and 12th causes of action, enjoin Defendants, and each of them, its successors, agents, employees and all other persons acting on its behalf, to cease and desist from refusing to comply with the statutory provisions described above.

5.    As to all causes of action, order such other and further relief as the Court may deem just and proper, including attorney fees and pre-judgment interest.

DATED:   April 19, 2011            LAW OFFICES OF JAMES A. OTTO


                                   BY:
                                      _____
                                      JAMES A. OTTO
                                      Attorney for Plaintiffs

-49-
**COMPLAINT**

Exhibit 1, Page 52